

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| CYNTHIA FRANKLIN, | ) | |
| | ) | **WD84816** |
| Respondent, | ) | |
| v. | ) | **OPINION FILED:** |
| | ) | |
| LEXINGTON INSURANCE | ) | **June 28, 2022** |
| COMPANY, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**Honorable Susan Margene Burnett, Judge**

**Before Division Four:**
**Cynthia L. Martin, C.J., Janet Sutton, J. and Laura Denvir Stith, Sp. J.**

Lexington Insurance Company (Lexington) appeals the judgment of the Jackson County Circuit Court concluding that it breached an insurance policy and awarding damages to the insured. On appeal, Lexington contends the trial court erred in its interpretation of the policy by applying the actual cash value settlement provisions, in concluding that labor costs could not be depreciated when issuing an actual cash value payment, and in concluding that the insured suffered damages. We affirm.

On approximately May 14, 2016, a storm damaged the roof of Cynthia and Roger Franklin's[1] residence in St. Louis, Missouri, and water intruded into the home (the property). Lexington insured the property by a homeowner's insurance policy effective October 1, 2015, to October 1, 2016.

Mrs. Franklin made a claim for the damage under the homeowner's insurance policy. Lexington accepted coverage and assigned an independent adjuster to prepare an estimate for the necessary repairs to the property. Lexington provided the adjuster a written claim assignment with instructions to estimate the actual cash value (ACV) and replacement cost value (RCV) of the loss. Lexington instructed the adjuster to "**depreciate materials and sales tax only**" when preparing his estimate for Mrs. Franklin's claim. (emphasis in original).

In mid-May 2016, a field adjuster from Lexington assessed the damage to the property and prepared an estimate. The adjuster used the Xactimate software[2] to calculate the claim's RCV, depreciation, and ACV. However, contrary to Lexington's instructions, the adjuster depreciated labor costs when calculating the ACV of Mrs. Franklin's loss.[3]

Through its software depreciation settings, Xactimate provided Lexington the option to depreciate labor costs when calculating the ACV of a claim.[4] When the

---

[1] Mr. Roger Franklin passed away in 2017 before Mrs. Franklin filed her lawsuit against Lexington. For the rest of this opinion, we will refer to the insured as Mrs. Franklin only.

[2] A witness at trial testified that Xactimate is widely used by insurance companies in the United States.

[3] In his estimate, the adjuster did not depreciate all categories of labor, including certain labor costs associated with roofing, gutters, and wallpaper.

[4] To depreciate labor costs, an adjuster checks the boxes in Xactimate titled "Depreciate Non-Material," "Depreciate Removal," and/or "Depreciate Overhead and Profit."

software applies depreciation to labor costs, the total amount of depreciation is increased which then lowers the policyholder's ACV payment.

The estimate provided that the RCV for the damages to Mrs. Franklin's property was $35,988.84.[5] From the RCV of $35,988.84, $8,915.52 of depreciation was deducted, leaving an ACV total of $27,073.32. Mrs. Franklin's $3,000 deductible was subtracted from the ACV amount, leaving Mrs. Franklin a "net claim" of $24,073.32.

In July 2016, Lexington issued a payment of $24,073.32 to Mrs. Franklin and her contractors. A July 7, 2016, letter to Mrs. Franklin further explained the payment. The letter indicated that the payment included an "actual cash value payment" for repairs that had been estimated but not yet completed, and the actual replacement costs for other repairs that Mrs. Franklin had completed and for which she had invoices. The letter advised Mrs. Franklin that she could "recover applicable depreciation for dwelling/building items" if she "submit[ted] paid repair invoices or receipts, showing that repairs/replacement have been completed."[6]

Mrs. Franklin completed some repairs to her property, and communicated this information to Lexington. Periodically from October 2016, until the end of December 2016, a desk adjuster from Lexington attempted to follow-up with Mrs. Franklin and requested additional information about the repairs. After no response, the desk adjuster made the following claim note: "[N]o response to the repeated inquiries for the HB on repairs. ALE paid and dmgs resolved for ACV. [C]losing claim[.]" Mrs. Franklin did

---

[5] The RCV figure included items totaling $6,642.52, for invoices for "work already performed" that were unrelated to potential future repairs to Mrs. Franklin's home. These items were not depreciated and are not the subject of dispute in this case.

[6] The letter also indicated that if Mrs. Franklin intended to file a claim for withheld depreciation she needed to do so within 180 days of the loss, unless she requested an extension in writing.

3

not submit invoices, receipts, or other documentation for further payments from Lexington, including any of the withheld depreciation. Lexington paid Mrs. Franklin a total sum of $24,073.32.

In February 2018, Mrs. Franklin filed a petition in Jackson County Circuit Court asserting that Lexington had breached the insurance contract. In her petition, Mrs. Franklin agreed that ACV could be calculated by "estimat[ing] the cost of repairing or replacing the damaged property, and then . . . subtract[ing] depreciation," and that "it was appropriate [for Lexington] to 'depreciate materials' when calculating the actual cash value." Mrs. Franklin contended that Lexington breached its contractual obligations by paying her less than the ACV amount to which she was entitled by withholding depreciation from the labor costs. Mrs. Franklin requested that the court enter judgment in her favor in the amount of the depreciated labor costs.

Lexington filed a motion for summary judgment, arguing that it had not breached the contract and Mrs. Franklin had not suffered damages. The trial court denied the motion, and the case proceeded to a bench trial. The parties stipulated that Lexington had withheld $5,424.79 in estimated labor costs from the July 2016 ACV payment to Mrs. Franklin, an amount that Xactimate confirmed. At trial, Mrs. Franklin confirmed that she only sought recovery of the labor costs withheld as depreciation from her ACV payment. Lexington's desk adjuster confirmed that if she knew the field adjuster had depreciated labor costs on Mrs. Franklin's claim before the lawsuit was filed, she would have requested a correction from the adjuster, and would have ultimately issued a higher ACV payment to Mrs. Franklin.

4

Following the bench trial, the trial court entered judgment in Mrs. Franklin's favor for $5,424.79, plus all taxable court costs and applicable post-judgment interest. The trial court concluded that Lexington breached the contract by improperly withholding $5,424.79 in labor costs from the ACV payment, and the court disagreed with Lexington's contention that the minimum payment owed to Mrs. Franklin under the policy was not ACV but rather the actual costs of repair. Lexington appeals.

## Legal Analysis

Lexington raises three points on appeal. In its first point, Lexington contends that the trial court erred in applying the policy's ACV loss settlement provisions instead of the policy's replacement cost loss settlement provisions. In its second point, Lexington argues it satisfied its payment obligations under the policy and the trial court erred in finding that Mrs. Franklin suffered damages. Finally, Lexington argues that the trial court erred in concluding that Lexington could not withhold depreciation on estimated labor costs from Mrs. Franklin's ACV payment.

We will first address whether the trial court erred in applying the policy's ACV loss settlement provisions instead of the replacement cost loss settlement provisions, Lexington's first point. Then we will turn to Lexington's third and second points; whether Lexington breached its contractual obligation when it deducted labor depreciation from Mrs. Franklin's ACV payment, and whether Mrs. Franklin proved that she suffered damages due to Lexington's breach.

We review court-tried cases under the standard set forth in *Murphy v. Carron* and will affirm the judgment unless it is against the weight of the evidence, it is not supported by substantial evidence, or it erroneously declares or applies the law. 536

S.W.2d 30, 32 (Mo. banc 1976). "Where . . . resolution of the case involves the interpretation of an insurance contract, we give no deference to the circuit court as contract interpretation is a question of law that we review *de novo*." *Blumer v. Auto. Club Inter–Ins. Exch.*, 340 S.W.3d 214, 218 (Mo. App. W.D. 2011) (citing *Jones v. Mid–Century Ins. Co.*, 287 S.W.3d 687, 690 (Mo. banc 2009)).

<u>Application of the Policy's ACV Provision</u>

Lexington argues in its first point that the trial court erred by applying the policy's ACV loss settlement provisions, because, it contends, the policy's replacement cost loss settlement provisions applied to Mrs. Franklin's claim.[7] Lexington argues that the policy required Mrs. Franklin to affirmatively choose ACV coverage, and that the evidence demonstrated Mrs. Franklin consistently sought replacement cost coverage. We disagree.

Generally, most property insurance policies have two forms of coverage – ACV and RCV. Under ACV coverage, the primary purpose is indemnity, and insureds who suffer a covered loss are entitled to be put back in the position they were in before the loss. Therefore, ACV permits an insurer to depreciate the claimed loss. With RCV coverage, the insured is entitled to receive a payment representing the ACV of the loss, and if repairs are done, the insured is entitled to an additional payment representing the

---

[7] We note that this assertion conflicts with Lexington's memorandum in support of its motion for summary judgment, in which Lexington stated that it "paid the actual cash value before repairs were completed," and its statement of uncontroverted material facts in support of its motion for summary judgment in which it stated, "[t]he [e]stimate also showed a total amount of depreciation of $8,915.52 at the time of loss, resulting in an Actual Cash Value of $27,073.32."

cost of the repair/replacement, to the extent that the cost exceeds the ACV payment. *See* Allan D. Windt, 3 INS. CLAIMS AND DISPUTES § 11:35 (6th ed. 2020).[8]

Here, the loss settlement portion of the policy obligated Lexington to do the following:

**C. Loss Settlement**

. . . .

2. Buildings covered under Coverage **A** or **B** at replacement cost without deduction for depreciation, subject to the following:

> a. If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of any deductible and without deduction for depreciation, but not more than the least of the following amounts:
>
> > (1) The limit of liability under this policy that applies to the building;
> >
> > (2) The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or
> >
> > (3) The necessary amount actually spent to repair or replace the damaged building . . . .
>
> b. If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:
>
> > (1) The actual cash value of that part of the building damaged; or
> >
> > (2) That proportion of the cost to repair or replace, after application of any deductible and without deduction for

---

[8] This serves as just general background on two common forms of coverage, but the specific language in each insurance policy would control a claim and may vary.

depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

. . . .

d. We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss as noted in 2.a and 2.b above.

In this case, the policy provides for a "two-step" claim adjustment process.[9] In the first step, Lexington determines the ACV of a covered loss and issues an ACV payment. The second step of the process is for the policyholder to request additional payment for RCV coverage. Here, the policy provides for RCV coverage only after repairs are completed.

On this issue, the trial court concluded that when Mrs. Franklin made her claim for property damage, she did not specify if she sought ACV or RCV coverage, and Lexington never sought clarification or provided Mrs. Franklin with information to make a "knowing election." The court noted that in her lawsuit, Mrs. Franklin only sought recovery under the policy's ACV coverage provision.

Lexington attempts to reverse the policy's two-step settlement process by arguing that the default coverage was for replacement cost benefits unless Mrs. Franklin affirmatively chose otherwise. We disagree. Nothing in the policy required

---

[9] At trial, a witness summarized the two-step process in "most" homeowner's policies:
> [W]hen a loss occurs, the first step is actual cash value. The insured has no—there's nothing that the insured has to do to receive an actual cash value payment. But in order to receive a replacement cost payment, there are conditions of the policy that must be met and those policy conditions are determined by the insurance company or the adjuster on the file.

See also Arnold v. State Farm Fire & Cas. Co., 268 F.Supp.3d 1297, 1300 (S.D. Ala. 2017) (summarizing two-steps).

8

Mrs. Franklin to affirmatively state that she was filing a claim under the ACV coverage provisions.

Lexington's interpretation of the policy would mean that Mrs. Franklin was obligated to seek an RCV payment upon repairing the damage to the property. However, we conclude that this obligation is disclaimed in the policy, which notes,

> e. You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss to buildings on an actual cash value basis. You may then make claim for any additional liability according to the provisions of this Condition C. Loss Settlement, provided you notify us of your intent to do so within 180 days after the date of loss.

The policy indicates that "additional liability" refers to replacement cost benefits, which are "the cost to repair or replace, after application of any deductible and without deduction for depreciation[.]" The policy language, "may then make claim for any additional liability" is permissive – the policyholder receives an ACV payment first, and then may put the ACV payment toward repairs or not. The policyholder can then choose whether to make an additional claim for payment under the RCV provision if they make repairs. A Lexington claim supervisor also agreed at trial that, under the policy, ACV payments are "no[-]strings[-]attached" payments, and an insured does not need to make repairs to receive an ACV payment. Under the plain language of the policy, Mrs. Franklin could choose whether to pursue an ACV or RCV payment, and she was not required to make a claim for RCV if she undertook repairs.

The record establishes that Lexington sent Mrs. Franklin a single ACV payment and that Mrs. Franklin did not seek an additional payment through the replacement cost provisions in the policy. Lexington's July 7, 2016, letter to Mrs. Franklin stated that "an actual cash value payment" was issued to Mrs. Franklin and identified the ACV

9

amount of the claim. The letter indicated that the ACV amount was calculated by subtracting the deductible and depreciation. The letter then advised Mrs. Franklin that to "recover applicable depreciation for dwelling/building items[,]" (which necessarily refers to replacement cost benefits), Mrs. Franklin needed to submit paid repair invoices or receipts, showing the repairs were completed.

A Missouri federal court, interpreting Missouri law, rejected an argument that "policyholders were obligated to seek an RCV payment upon actually repairing or replacing damage to their home and that the limitations applicable to the RCV payment are equally applicable to an ACV payment." *Lafollette v. Liberty Mut. Ins. Co.,* 2017 WL 1026424 at *8 (W.D. Mo. Mar. 16, 2017). In *Lafollette,* the court concluded that the following policy language (which is nearly identical to the policy language in this case) "explicitly disclaimed" such an obligation:

> d. You may disregard the replacement cost loss settlement provisions and make a claim under this policy for loss or damage to buildings on an actual cash value basis. You *may* then make claim within 180 days after the loss for any additional liability . . . .

*Id*. at *9. The court held that this provision made it the policyholder's choice "whether to pursue an ACV or RCV payment" and that

> the ACV payment is not transformed into an RCV payment simply because the policyholder chooses to use her ACV payment to repair damage to her home, much less because the ACV payment was sufficient to cover the cost of repairs. If the policyholder chose not to seek the RCV payment under these circumstances, as the policy permitted her to do, the ACV payment is not effectively transformed into an RCV payment and subject to limitations only applicable to RCV payments.

*Id*.

Lexington correctly notes that Mrs. Franklin never submitted invoices, receipts, or other documentation for further payments from Lexington. Mrs. Franklin was

10

entitled to accept only an ACV payment for the damage to her property, and the policy did not require Mrs. Franklin to submit invoices or other documentation of repairs unless she chose to proceed further under the RCV provisions of the policy.[10] The trial court did not err in applying the ACV loss provisions of the policy. Lexington's first point is denied.

Labor Depreciation

Having decided that Mrs. Franklin only pursued an ACV payment under the policy, we now turn to whether Lexington breached its contractual obligation to pay ACV by depreciating labor costs from the payment it issued to Mrs. Franklin. Lexington argues that the trial court erred in concluding that Lexington could not withhold estimated labor costs as depreciation from Mrs. Franklin's ACV payment because, they contend, the policy and Missouri law permit calculating ACV in such a manner.[11] Mrs. Franklin argues that Lexington could not withhold labor costs as depreciation from the ACV payment because the policy is ambiguous on whether labor costs may be depreciated, and the ambiguity must be construed against Lexington and in her favor. Mrs. Franklin does not dispute that Lexington is entitled to depreciate the cost of materials, but she argues that the depreciation of labor costs is inconsistent with the principle of indemnity.

"The general rules for interpretation of contracts apply to insurance policies." *Blumer*, 340 S.W.3d at 218 (citation omitted). When we interpret insurance policies,

---

[10] Compare this situation with *Kastendieck v. Millers Mutual Insurance Co. of Alton Ill.*, where we held that the insurer was not obligated to pay an insured any additional replacement cost payments when the insured did not submit proof that he repaired or replaced the property, and the policy language unambiguously stated the insurer "w[ould] pay no more than the actual cash value for the loss or damage until the actual repair or replacement is complete." 946 S.W.2d 35, 40 (Mo. App. W.D. 1997).

[11] Lexington's point three.

11

we start with the language contained within the policy to determine its meaning. *Ferguson v. St. Paul Fire & Marine Ins. Co.*, 597 S.W.3d 249, 255 (Mo. App. W.D. 2019). When a term is defined in a policy, we will normally look at that definition and nowhere else to ascertain its meaning. *Id.* at 256. "However, when terms are undefined we give terms their ordinary meaning, which is the meaning that the average layperson would reasonably understand . . . . " *Id. See also Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. banc 2010). To determine the ordinary meaning of a term, we can consult standard English language dictionaries. *Ferguson*, 597 S.W.3d at 256 (citation omitted).

"If the language is ambiguous, we resolve the ambiguity against the insurer-drafter." *Arch Ins. Co. v. Sunset Fin. Servs., Inc.*, 475 S.W.3d 730, 733 (Mo. App. W.D. 2015).

> An ambiguity arises when there is duplicity, indistinctness, or uncertainty in the meaning of words used in the contract. Language is ambiguous if it is reasonably open to different constructions and the language used will be viewed in the meaning that would ordinarily be understood by the layman who bought and paid for the policy.

*Krombach v. Mayflower Ins. Co., Ltd.*, 827 S.W.2d 208, 210 (Mo. banc 1992). "[I]n construing the terms of an insurance policy, this Court applies the meaning which would be attached by an ordinary person of average understanding if purchasing insurance and resolves ambiguities in favor of the insured." *Burns,* 303 S.W.3d at 509 (citations omitted). This rule is the doctrine of "*contra proferentem*," which provides that ambiguities in contracts are construed against the drafter, and it is applied "more rigorously in insurance contracts than in other contracts" in Missouri. *Id.*; *see also Mansion Hills Condo. Ass'n v. Am. Fam. Mut. Ins. Co.,* 62 S.W.3d 633, 638 (Mo. App.

12

E.D. 2001) ("When interpreting language of an insurance policy that is not defined, courts must give a term its ordinary meaning unless it plainly appears that a technical meaning was intended.").

The dispute here is whether, in the absence of an express provision in the insurance policy, Lexington could lawfully withhold labor depreciation from Mrs. Franklin's ACV payment. The trial court concluded that the policy was ambiguous on the issue of withholding labor cost depreciation from an ACV payment, and that the policy was silent on any definition for depreciation. The trial court construed the policy against Lexington, as the drafter of the policy, and concluded the following:

> The dictionary definition of the term "depreciation" primarily describes the concept of "depreciation" as being related to the tangible loss of value of property due to the physical deterioration and wear and tear of that item and not something intangible, such as labor costs . . . . An ordinary policyholder would not know what labor depreciation is or expect labor costs to be depreciated from an ACV payment.

The trial court concluded that depreciation of labor costs was not permitted in the interpretation of ACV under this specific policy and Lexington breached the policy by withholding estimated labor costs from the ACV payment issued to Mrs. Franklin.

Here, in the loss settlement portion, the policy provides:

> b. . . . we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:
>
>> (1) The **actual cash value** of that part of the building damaged; or
>>
>> (2) That **proportion of the cost to repair or replace, after application of any deductible and without deduction for depreciation,** that part of the building damaged . . . .

(emphasis added). The policy does not define "actual cash value" or "depreciation." However, "[u]nder Missouri law, '[a]ctual cash value means a depreciated sum, i.e.,

13

the difference between the reasonable value of the property immediately before and immediately after the loss.'" *In re State Farm Fire & Cas. Co.*, 872 F.3d 567, 573 (8th Cir. 2017) (citing *Porter v. Shelter Mut. Ins. Co.,* 242 S.W.3d 385, 390 (Mo. App. W.D. 2007), *Wells v. Mo. Prop. Ins. Placement Facility*, 653 S.W.2d 207, 210 (Mo. banc 1983), and *Dollard v. Depositors Ins. Co.,* 96 S.W.3d 885, 889 (Mo. App. W.D. 2002)).[12]

"While the term 'actual cash value' has an unambiguous meaning under Missouri law—the difference in the fair market value of the damaged property immediately before and after the loss—it is a value that must be estimated." *Id.* at 574. Under an actual cash value policy, the insured bears the share of the loss resulting from deterioration. *Id.* "[A] reduction in the immediately-before value of the property must be estimated." *Id.* A jury must determine the conflicting estimates "unless the parties agree as to the amount of the damage or have it determined by an appraisal method agreed to in the policy." *Id.* (citing *Dollard*, 96 S.W.3d at 890). "A 'depreciation' deduction is the most common, but not the only acceptable method of estimating the reduced fair market value of the damaged property." *Id.*

---

[12] *Wells* involved Missouri statutes dealing with fire damage, sections 379.140-.145, .160, and section 379.150 RSMo 1978, and policies issued under the Missouri FAIR (Fair Access to Insurance Requirements) Plan. *Wells v. Mo. Prop. Ins. Placement Facility*, 653 S.W.2d 207, 208 (Mo. banc 1983). In *Wells*, the court stated that "[t]he value of the property at the point immediately before the loss is, of course, equivalent to the actual value of the property at the time of the loss. Cost of repair is admissible as evidence of damage, but of itself it is insufficient to establish the amount of damage." *Wells*, 653 S.W.2d at 214. The court concluded that an insured who chooses a cash payment is "entitled under § 379.150. . . [to] a sum 'equal to the damage done on the property' . . . [which] our courts have long held . . . to be determined by the difference in value of the property immediately before and immediately after the loss." *Id.* at 214 (citations omitted).

In *Dollard*, we recognized that the reasoning in *Wells* extended beyond the statutory scheme for "policies issued under the Missouri FAIR Plan" and was "applicable to regular insurance policies, as well." *Dollard v. Depositors Ins. Co.*, 96 S.W.3d 885, 888 (Mo. App. W.D. 2002).

14

The Missouri Department of Insurance defines "actual cash value" as "the replacement cost of property minus depreciation. (Actual [c]ash [v]alue can also be determined by market value, if any.)." *See* Missouri Department of Insurance, Glossary of Terms (alphabetical), https://insurance.mo.gov/consumers/glossary.php (last visited June 13, 2022).

One dictionary definition of "depreciation" is "a loss in the value of property due to physical deterioration and wear or to obsolescence and lack of adaptability[.]" *Depreciation*, Merriam-Webster, https://www.merriam-webster.com/legal/depreciation (last visited June 13, 2022). Sources from the insurance realm also confirm that depreciation "is the amount an item has lessened in value since it was purchased, taking into account age, wear and tear, market conditions, and obsolescence." Richard J. Cohen, et al., 5 NEW APPLEMAN ON INS. LAW LIBRARY ED. §47.04[2][a] (2020). "[T]he principal definition attributable to [depreciation] refers to 'physical deterioration.'" *Id.* The Missouri Department of Insurance defines "depreciation" as "[p]hysical wear and tear or technological or economic obsolescence." *See* Missouri Department of Insurance, Glossary of Terms (alphabetical), https://insurance.mo.gov/consumers/glossary.php (last visited June 13, 2022).

Mrs. Franklin argues that labor could not be withheld as depreciation in her ACV payment because the policy was ambiguous on the issue, and it must be construed against Lexington. Lexington argues that the term "actual cash value" has an unambiguous meaning in Missouri, and withholding depreciation on all estimated replacement costs, including labor costs, is a reasonable method for it to calculate actual cash value. No Missouri state court has resolved this specific issue. Courts

15

around the country are split on their approaches to the labor depreciation issue, with some courts concluding that labor costs cannot be depreciated, and some concluding the contrary. Because there is no conclusive controlling Missouri authority on this specific issue, we can look to persuasive authority from other jurisdictions. We conclude that in this case, depreciation, without a specific definition or provision in the insurance policy to say otherwise, applies to physical deterioration and does not include labor costs.[13]

Generally, courts have used one of three methodologies to measure ACV coverage in the absence of a contractual provision prescribing the method by which an insurer will determine ACV coverage: (1) market value; (2) replacement cost minus depreciation; or (3) the broad evidence rule. The market value method considers what a buyer would give and what a seller would take for the property in the open market. Replacement cost less depreciation provides full replacement cost reduced by depreciation. The broad evidence rule provides that any evidence that logically tends to establish a correct estimate of the value of damaged or destroyed property should be considered in determining ACV at the time of loss. *See* J.A. Tyler, Annotation, *Test or Criterion of "Actual Cash Value" under Insurance Policy Insuring to Extent of Actual Cash Value at Time of Loss,* 61 A.L.R.2d 711 §5 (1958 & 2022 Cum. Supp.).

---

[13] Other courts have come to a similar conclusion. *See Perry v. Allstate Indem. Co.*, 953 F.3d 417, 423 (6th Cir. 2020) (applying Ohio law and concluding that insured's interpretation of the undefined term depreciation was reasonable because "depreciation traditionally refers to value lost from physical wear and tear"); *Dickler v. Cigna Prop. & Cas. Co.*, 957 F.2d 1088, 1099 (3d Cir. 1992) (applying New York law and holding "that, in the present context, depreciation is properly defined as physical deterioration" and acknowledging that while physical deterioration is not the only possible definition of depreciation, ambiguities must be construed in favor of the insured); *Lammert v. Auto-Owners (Mut.) Ins. Co.*, 572 S.W.3d 170, 179 (Tenn. 2019) (concluding that depreciation, "in its ordinary sense . . . applies to physical deterioration").

As Missouri has no statute or regulation requiring an insurer to use a specific one of these or other methods to determine ACV, the method used is a matter the parties can agree to by contract. In this case, Lexington's adjuster confirmed that Lexington calculated Mrs. Franklin's ACV as replacement cost less depreciation (RCLD) using the Xactimate software. As we will discuss below, while cases applying the other methods are relevant, the jurisdictions following the RCLD method of determining ACV provide the most guidance in interpreting this contract.

One of the first and most widely cited appellate court opinions to address the labor depreciation question was the Oklahoma Supreme Court in *Redcorn v. State Farm Fire & Casualty Co.*, 55 P.3d 1017 (Okla. 2002). In *Redcorn*, the insured's roof was damaged in a storm. *Id.* at 1019. The insured had a policy that provided for payment of actual cash value at the time of the loss for damage to roof surfaces. *Id.* at 1018-19. The insured received a payment for the actual cash value of the damage to the roof and the payment included a deduction for depreciation of both materials and labor. *Id.* at 1019. The policy did not define "actual cash value" and it did not prescribe a method for determining actual cash value. *Id.* The insured brought an action in federal court contending that only the materials component of a roof replacement should be depreciated. *Id.* at 1018. The insured argued that depreciating labor was inconsistent with principles of indemnity, which seeks to place the insured in the same position as if no loss had occurred. *Id.* at 1020. The insured reasoned that the insurer should not be allowed to depreciate labor because if it were possible to purchase depreciated shingles, the cost of the labor to install them on the roof would be the same as the cost to install new shingles. *Id.*

The district court certified the question to the Supreme Court of Oklahoma, and the court ruled 5-3 in the insurer's favor. *Id.* at 1021. The majority stated that a "roof is the product of materials and labor" and rejected the insured's argument that indemnity principles precluded labor depreciation. *Id.* at 1020-21. The *Redcorn* majority noted that in Oklahoma, the "broad evidence rule" determined "actual cash value." *Id.* at 1020. Under that rule, all relevant evidence should be "considered in determining a loss. A roof is the product of both materials and labor just as a building is the product of both materials and labor." *Id.* at 1021. Finally, the court explained that the insured chose an ACV policy and he "insured a roof surface, not two components, materials and labor. He did not pay for a hybrid policy of actual cash value for roofing materials and replacement costs for labor." *Id.* The majority believed that the insured would be unjustly enriched if his arguments regarding labor depreciation were accepted. *Id.*

Two judges filed separate dissents in the case. *Id.* One dissenter, joined by two other judges, rejected the majority's premise that a roof is "a single product[,]" and that a customer cannot "go to the lumber yard or the retail store and buy a roof." *Id.* at 1022 (Boudreau, J., dissenting). This dissent viewed the roof as "a combination of a product (shingles) and a service (labor to install the shingles)." *Id.* The dissent explained that although the shingles themselves were "logically depreciable" because they lose value due to wear and tear, "[l]abor, on the other hand, is not logically depreciable." *Id.* The dissenting judge further elaborated his reasoning as follows:

> Does labor lose value due to wear and tear? Does labor lose value over time? What is the typical depreciable life of labor? Is there a statistical table that delineates how labor loses value over time? I think the logical answers are no, no, it is not depreciable, and no. The very idea of

18

depreciating the value of labor is illogical. The image that comes to me is that of a very old roofer with debilitating arthritis who can barely climb a ladder or hammer a nail. The value of his labor, I suppose, has depreciated over time.

*Id*. The dissenter believed that the insurer needed to pay the insured the value of the shingles, depreciated for wear and tear, plus the installation cost to properly indemnify him. *Id.* at 1023.

Another judge, in a separate dissent, observed that before the damage, the insured had a roof with sixteen-year-old shingles. *Id.* at 1023 (Summers, J., dissenting). After the damage, the insured was "contractually entitled to have on his house sixteen-year-old shingles, or their value in money. He should not bear any of the cost of installing them, because that would deprive him of that for which he contracted-being made whole as if the damage had not occurred." *Id.*

Since *Redcorn* was decided, state and federal courts have split on the issue, with courts, in general, following the reasoning in the *Redcorn* majority or its dissents. We briefly discuss below some of these cases that have concluded labor is not depreciable in the absence of an express insurance provision allowing for it.

The Supreme Court of Arkansas considered the issue in *Adams v. Cameron Mutual Insurance Co.,* 430 S.W.3d 675 (Ark. 2013). In *Adams*, a tornado damaged the insureds' home. *Id.* at 676. The insureds' policy did not define "actual cash value." *Id.* The insurer issued a payment that included both material and labor depreciation. *Id.* The insured sued, alleging that the insurer breached the insurance policy by applying depreciation to the labor portion of the repairs. *Id.* at 677. The court held that the term actual cash value was ambiguous because it was "fairly susceptible to

19

more than one reasonable interpretation" and that labor is not logically depreciable, agreeing with the *Redcorn* dissenting opinions. *Id.* at 678-79.[14]

The Supreme Court of Tennessee considered the labor depreciation issue in *Lammert v. Auto-Owners (Mutual) Insurance Co.*, 572 S.W.3d 170, 172 (Tenn. 2019), where two sets of insureds had homes that suffered storm damage. One insured had a policy that defined actual cash value as "the cost to replace damaged property with new property of similar quality and features reduced by the amount of depreciation applicable to the damaged property immediately prior to the loss[.]" *Id*. at 173. The other insured's policy did not define actual cash value but the policy stated that "actual cash value includes a deduction for depreciation." *Id.* The parties agreed that under both policies, the method used to calculate actual cash value was replacement cost less depreciation. *Id.* Neither policy specifically mentioned labor costs. *Id.*

The court in *Lammert* quoted a Black's Law Dictionary definition of depreciation,[15] and ultimately concluded that, under the policies at issue, labor may not be depreciated when the insurance company calculates the actual cash value using the replacement cost less depreciation method. *Id.* at 174, 179. The court stated that when both parties have presented "plausible interpretations of the policies," the court must adopt the interpretation that favors the insured. *Id.* at 178-79. The court stated that because depreciation refers to physical wear and tear, it would be reasonable for a

---

[14] *Adams* was subsequently superseded by statute. *See* ARK. CODE ANN. § 23-88-106(a)(2) (2017) ("'Expense depreciation' means depreciation, including but not limited to the cost of goods, materials, labor, and services necessary to replace, repair, or rebuild damaged property.").

[15] Black's Law Dictionary defines depreciation as "'[a] reduction in the value or price of something; specif[ically] a decline in an asset's value because of use, wear, obsolescence, or age.'" *Lammert*, 572 S.W.3d at 174 (quoting Black's Law Dictionary (10th ed. 2014)).

homeowner to understand that depreciation only applied to material goods that can age and experience wear and tear. *Id.* at 178.

In *Mitchell v. State Farm Fire & Casualty Co.,* 954 F.3d 700, 703 (5th Cir. 2020), the Fifth Circuit, applying Mississippi law, held that an insurance policy that refers to "actual cash value" without further definition was ambiguous and construed the ambiguity against the insurer. In *Mitchell*, a storm damaged the insured's home. *Id.* at 703. The insurance policy initially paid ACV and then RCV if the repairs to the home were completed within a specific time period. *Id.* at 706-07 n.6. Actual cash value was defined by a Mississippi statute as "'the cost of replacing damaged or destroyed property with comparable new property, minus depreciation and obsolescence.'" *Id.* at 704 (quoting MISS. CODE ANN. § 83-54-5(a) (2019)). The Fifth Circuit used the following example to explain the difference between the insurer and the insured's definitions of ACV:

> To understand the difference between the two parties' proffered definitions of "Actual Cash Value," we will take a hypothetical destroyed roof as an example. [The insured's] interpretation of "Actual Cash Value" includes depreciation of only the *material* components of the roof. Suppose the hypothetical roof can be replaced for a cost of $5,000 in materials and $5,000 in labor—a $10,000 roof. Suppose that the destroyed roof was 10 years old and expected to last 20 years. Under [the insured's] interpretation, the Actual Cash Value would be $7,500, because $2,500 would be deducted in depreciation (half of the cost of the *materials*).
> By contrast, [the insurer's] interpretation of "Actual Cash Value" includes depreciation of both the materials *and* the labor in constructing the roof. Using the same example, [the insurer's] interpretation would yield an Actual Cash Value of $5,000, because $5,000 would be deducted in depreciation (half of the *total* cost of replacing the roof).

*Id.* at 706. The Fifth Circuit noted that its task was to determine if the insured's interpretation of "actual cash value" was a reasonable one—not necessarily the most reasonable—because if it was, the insured's interpretation must prevail. *Id.* at 706.

21

The court determined that the insured's interpretation of the policy, that only the material components of the roof could be depreciated, was reasonable because it restored her to the status she had at the moment before the loss. *Id*. at 706. The court also concluded that the insurer's interpretation of the policy, that both materials and labor could be depreciated, was reasonable. *Id.* at 706-07. Ultimately, the court concluded that the policy was ambiguous and held in the insured's favor. *Id.* at 707.

In *Sproull v. State Farm Fire & Casualty Co.*, 184 N.E.3d 203, 204 (Ill. 2021), the Supreme Court of Illinois considered whether an insurer could depreciate labor costs in determining the ACV of a covered loss when the policy did not define the term. In *Sproull*, the insured suffered wind damage to his home, and submitted a claim to the insurer. *Id.* at 205. Under the policy's terms, the insurer initially paid ACV for the loss, but if the insured completed repairs within two years, the insured would receive an additional amount up to the full replacement cost or policy limit, whichever was less. *Id.* The insured received an ACV payment that included a depreciation for labor. *Id.* The insured alleged a breach of contract, claiming that he was underpaid in his ACV payment when labor depreciation was deducted. *Id.*

The court in *Sproull* noted that "Illinois' insurance regulations provide that the 'actual cash value' or 'ACV' of an insured, damaged structure is determined as 'replacement cost of property at time of loss less depreciation, if any.'" *Id.* at 204. The court observed that both the insurer and the insured offered reasonable interpretations of actual cash value and depreciation. *Id.* at 221. However, because the policy (and the regulation it incorporated) was susceptible to multiple reasonable interpretations,

22

it was ambiguous, and the court was required to construe the policy against the insurer.

*Id.* The court reasoned:

> [I]f depreciation is understood to mean the physical deterioration of something tangible . . . then the phrase "depreciation, if any" logically would not include the depreciation of intangible things. From the [insured's] perspective, it would be [the insurer] that is adding language to the [Illinois insurance] regulation. [The insurer] would be reading the regulation as stating "replacement cost of property at time of loss less depreciation, if any, *applied even to intangibles such as labor that do not deteriorate*." We believe that the policy and the regulation it incorporates are susceptible to multiple reasonable interpretations and are therefore ambiguous.

*Id.* at 217 (citations omitted). The court held that, in the absence of a policy definition of actual cash value and with an Illinois insurance regulation defining actual cash value, when calculating the ACV of a covered loss, property materials and structure were subject to a reasonable deduction for depreciation, but depreciation could not be applied to the intangible labor component. *Id.* at 221.

We recognize that cases around the country, both at the state and federal level, arrive at the opposite conclusion, i.e., that labor can be depreciated in an ACV payment.[16] However, in the absence of specific policy language allowing for it, or a Missouri statute or insurance regulation providing for this practice, we are not persuaded by the reasoning in those cases.

We conclude that the policy was ambiguous on whether it allowed Lexington to depreciate labor when making an ACV payment to Mrs. Franklin. The fact that various

---

[16] *See, e.g., Graves v. Am. Fam. Mut. Ins. Co.*, 686 F. App'x 536 (10th Cir. 2017) (depreciable under Kansas law); *Butler v. Travelers Home & Marine Ins. Co.*, 858 S.E.2d 407 (S.C. 2021); *Accardi v. Hartford Underwriters Ins. Co.*, 838 S.E.2d 454 (N.C. 2020); *Henn v. Am. Fam. Mut. Ins. Co.*, 894 N.W.2d 179 (Neb. 2017); *Wilcox v. State Farm Fire & Cas. Co.*, 874 N.W.2d 780 (Minn. 2016).

jurisdictions have reached differing conclusions on this issue supports a finding of ambiguity. *See Harrison v. Tomes*, 956 S.W.2d 268, 270 (Mo. banc 1997) ("divergent conclusions reached by [other] jurisdictions is further evidence of [an] ambiguity").

Lexington argues that Mrs. Franklin's and the trial court's view, that only some of the replacement costs such as materials are depreciable, but not others such as labor, is illogical, unreasonable, and too narrow an interpretation of the term "actual cash value." We disagree. A policyholder would not reasonably expect that an ACV payment would be reduced by depreciation on estimated labor costs. This belief, that labor does not depreciate, "is a plausible conception for a wealth of thoughtful, knowledgeable judges, and it is even more so for lay insureds with no special competence in property or insurance matters." *Arnold v. State Farm Fire & Cas. Co.*, 268 F. Supp. 3d 1297, 1312 (S.D. Ala. 2017). If Lexington wished to depreciate labor, it had the ability to include such a provision in its policy, but it did not do so. The insurer, as the drafter of the policy, is in the better position to remove ambiguity from the insurance policy. *Burns*, 303 S.W.3d at 512. Lexington's argument regarding labor depreciation relies on a technical definition and understanding of depreciation that is not evident in the insurance policy. "[A]n insured should not have to consult a long line of case law or law review articles and treatises to determine the coverage he or she is purchasing under an insurance policy . . . unless a technical meaning is clearly provided in the insurance policy." *Lammert*, 572 S.W.3d at 179 (citation omitted).

Mrs. Franklin's interpretation of ACV and whether labor could be depreciated from her ACV payment is reasonable, and her interpretation is more in keeping with Lexington's actual practice at the time of trial. Lexington instructed its adjusters to

24

only depreciate materials and sales tax when calculating the ACV of a claim, and a representative testified that it was Lexington's "national position" to not depreciate labor when calculating ACV. Lexington's desk adjuster did not know that labor costs had been depreciated on Mrs. Franklin's claim and, had she realized it, she would have requested a correction from the adjuster. Additionally, when preparing Mrs. Franklin's estimate, Lexington did not depreciate all labor costs to replace or repair the damaged property. [17]

Lexington cites *In re State Farm Fire and Casualty Co. (LaBrier)*, 872 F.3d 567 (8th Cir. 2017) to support its position. In *LaBrier,* the Eight Circuit analyzed the claims of a group of Missouri homeowners who brought a putative class action and who argued that an insurer had breached their policies by deducting labor depreciation from their ACV payments. *Id.* at 571. On appeal, the Eighth Circuit, applying Missouri law, held that the term "actual cash value" "means a depreciated sum, i.e., the difference between the reasonable value of the property immediately before and immediately after the loss." *Id.* at 573 (citing *Porter*, 242 S.W.3d at 390, *Wells*, 653 S.W.2d at 209, and *Dollard*, 96 S.W.3d at 889). The policies at issue in *LaBrier* did not specify which method to use to determine the fair market value of a property before and after a destructive event. *Id.* at 576. The court also stated:

> While the term "actual cash value" has an unambiguous meaning under Missouri law—the difference in the fair market value of the damaged property immediately before and after the loss—it is a value that must be estimated. Conflicting estimates must be determined by a jury, unless the parties agree as to the amount of the damage or have it determined by an appraisal method agreed to in the policy. *See Dollard*, 96 S.W.3d at 890.

---

[17] In the record before us, we have been unable to find an explanation on why some, but not all, labor costs were depreciated. Even if one exists, it would not have a bearing on our decision.

*Id.* at 574. The court concluded that whether the insurer's chosen methodology produced a reasonable estimate of the difference in a property's value before and after a loss was a question for the jury to determine on a case-by-case-basis, and therefore, class certification was precluded. *Id.* at 576-77. Put a different way, because the policies did not specify how ACV payments would be calculated, whether the insurer was in breach of the policy would depend on whether its methodology produced a reasonable estimate of ACV, as defined by Missouri law, in each individual case.[18]

We do not find *LaBrier* persuasive. In *Labrier*, the insurer could have used different methods to estimate the fair market value of a property before and after a destructive event, and the policies in *LaBrier* did not specify which method to use. *Id.* at 576. Here, the policy describes RCV, in comparison to ACV, as "replacement cost without deduction for depreciation," and at trial, Lexington's adjuster confirmed that Lexington calculated ACV as replacement cost less depreciation (RCLD).[19]

In the absence of an express policy provision that allows for it, labor does not fall within that which can be depreciated when an insured is entitled to an ACV payment. Having found the policy ambiguous on whether labor can be depreciated, we

---

[18] A year after *LaBrier,* the Eighth Circuit, applying Arkansas law, ruled *in Stuart v. State Farm Fire & Casualty Co.*, 910 F.3d 371, 377 (8th Cir. 2018), that the district court did not abuse its discretion in concluding that the insurer's violation of its contractual obligations by withholding labor depreciation when calculating ACV was a common question well-suited for class-wide resolution. In *Stuart,* the policies specified the method for calculating ACV payments as "the amount it would cost to repair or replace damaged property, less depreciation." *Id.* at 376. The court stated that the insurer's

> obligation . . . was not merely to arrive at a "reasonable" estimate of the property's value before and after the loss, but to calculate the ACV payment in accordance with the prescribed formula. There is no need for a jury to evaluate conflicting estimates based on different methodologies; the parties agreed on a methodology and the only dispute is over including labor depreciation in the calculation, which is a discrete portion of the formula that is easily segregated and quantified.

*Id.*

[19] This opinion should not be read to suggest that ACV should be determined by RCLD in all cases where "actual cash value" is undefined in a first-party property insurance policy.

26

must construe the policy liberally in favor of Mrs. Franklin and strictly against Lexington. Accordingly, we hold that labor may not be depreciated under an insurance policy that does not define ACV or depreciation to expressly include labor depreciation. The trial court did not err in holding that Lexington breached the policy by withholding labor costs as depreciation from the ACV payment issued to Mrs. Franklin. Lexington's third point is denied.

Damages

Finally, we turn to whether Mrs. Franklin proved that she suffered damages from Lexington's breach of the insurance policy. Lexington argues that the trial court erred in finding Mrs. Franklin proved she suffered damages because it argues the policy stated that Lexington would pay no more than the amount actually spent by Mrs. Franklin to repair or replace the property, that Lexington's payments exceeded the amount Mrs. Franklin actually spent to repair the damage, and she did not submit invoices for additional repairs to the property.[20]

When an insured alleges a breach of an insurance contract, they must show (1) a contract that included certain rights and obligations existed between the parties, (2) the insurer breached its obligation under the contract, and (3) damages. *See D.R. Sherry Constr. Ltd., v. Am. Fam. Mut. Ins. Co.,* 316 S.W.3d 899, 904 (Mo. banc 2010).

Lexington argues that its payment obligation was capped at "the necessary amount actually spent to repair or replace the damaged building[,]" which appears in section 2.a(3) of the loss settlement portion of the policy. Mrs. Franklin argues that the limitation in section 2.a(3) does not apply because she was entitled to a full ACV

_____

[20] Lexington's point two.

27

payment (one in which depreciation for estimated labor costs was not withheld), regardless of the repair costs.

Lexington's "actual cost" of repairs argument is not persuasive here because that provision of the policy does not apply to ACV payments, and Mrs. Franklin's breach of contract lawsuit arises out of the actual cash value provisions in her policy. The actual cash value coverage terms appear under "Section C Loss Settlement" in sections 1(a)-(d) and 2(d)-(e). The "actual cost" provision that Lexington relies on is in the replacement cost provisions in "Section C Loss Settlement" 2(a)-(c). As we have explained above, Mrs. Franklin's claim was not for RCV coverage.

Lexington's own witness acknowledged that the Xactimate software calculated Mrs. Franklin's ACV as of the date of the loss and thus, the actual costs of repair were "irrelevant" to the determination of ACV at the time of the loss. The ACV amount was calculated the same way regardless of whether the policyholder repaired the damaged property after the loss.

Lexington, using the "actual cost" provision, argues that the ACV payment to Mrs. Franklin sufficiently covered the cost of repairs. However, this misses the mark. The question is not whether the ACV payment was sufficient to cover the costs of repair or replacement, but whether Lexington was entitled to deduct labor depreciation in the first place from that payment. Lexington's obligation to pay Mrs. Franklin an ACV payment was not tied to the "actual costs of repair" language which is only contained in the policy's RCV provision.

The ACV payment, as Lexington's own representative testified, was "no strings attached," and Mrs. Franklin was under no obligation to make the repairs to the

28

property. What to do with the ACV payment was her choice- whether to put it towards the cost of repairs and seek an additional RCV payment under the policy, or simply receive a one-time ACV payment (as she did here).

The policy obligated Lexington to pay Mrs. Franklin the properly calculated ACV of her claim, but Lexington paid her less by withholding labor depreciation from her ACV payment. Mrs. Franklin's ACV payment would have been larger had labor costs not been included in the depreciation calculation, therefore, Mrs. Franklin proved she suffered damages. Mrs. Franklin's damages were $5,424.79, the amount of withheld labor depreciation.

Lexington breached the insurance policy by improperly withholding depreciation on labor costs in calculating the ACV of the loss, resulting in damages. The trial court did not err in concluding that Mrs. Franklin proved she suffered damages. Lexington's second point is denied.

## Conclusion

The judgment of the trial court is affirmed.

_____
Janet Sutton, Judge


Martin, C.J. and Stith, Sp. J. concur.