# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3185

No. 16-3562

_____

In re: State Farm Fire and Casualty Company

*Petitioner/Defendant - Appellant*

------------------------------

Amanda LaBrier

*Respondent/Plaintiff - Appellee*

------------------------------

Chamber of Commerce of the United States; Liberty Mutual Fire Insurance Company; Safeco Insurance Company of America; Lawyers for Civil Justice; Allstate Insurance Company; American Family Mutual Insurance Company; American Insurance Association; Property Casualty Insurers Association of America;

*Amici on Behalf of Petitioner/Appellant*

United Policy Holders

*Amicus on Behalf of Respondent/Appellee*

Appeals from United States District Court
for the Western District of Missouri - Jefferson City

Submitted: January 11, 2017
Filed: September 25, 2017

Before WOLLMAN, LOKEN, and MURPHY, Circuit Judges.

LOKEN, Circuit Judge.

A hailstorm struck Amanda LaBrier's home in St. Louis, Missouri, damaging the home's exterior roof, siding, and gutters. LaBrier filed a property damage claim with State Farm Fire and Casualty Company under the Coverage A - Dwelling section of her State Farm Homeowners Policy. The policy provides "Replacement Cost" property loss coverage, that is, "the cost to repair or replace . . . the damaged part of [covered] property." However, the policy's Loss Settlement provisions state that, "until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property . . . not to exceed the cost to repair or replace the damaged part." The policy does not define actual cash value. State Farm provides insureds a "Building Estimate Summary Guide" that explains, "Net Actual Cash Value Payment" means "[t]he repair or replacement cost of the damaged part of the property less depreciation and deductible," and defines "depreciation" as "[t]he decrease in the value of property over a period of time due to wear, tear, condition, and obsolescence."

State Farm's adjuster inspected LaBrier's home, determined the dwelling had suffered covered property damage, and estimated replacement cost by inputting each damaged part into a computer program called Xactimate. The Xactimate estimate of total cost to repair LaBrier's home was $8,088.07. Consistent with State Farm's practice in Missouri at that time, Xactimate also estimated depreciation at $2,009.79 by multiplying each damaged item's replacement cost by a depreciation factor that

-2-

varied with the item's age.  State Farm subtracted this estimated depreciation and LaBrier's deductible ($1,421) from the estimated replacement cost and paid LaBrier $4,657.28 for the actual cash value of the damaged property.  In a statement attached to the payment, State Farm explained, "[b]ased on our estimate, the additional amount available to you for replacement cost benefits (recoverable depreciation) is $2,009.79."

Rather than seek an additional replacement cost benefit under the policy, or challenge State Farm's estimated actual cash value payment by an appraisal proceeding or by an action in court -- remedies the policy expressly authorizes -- LaBrier paid a family friend $5,975 to repair her home and brought this putative class action in Missouri state court, alleging that State Farm's practice of deducting "labor depreciation" from estimated replacement cost in determining actual cash value breached the insurance contract.  State Farm removed the case to federal court and moved to dismiss.  The district court denied the motion, concluding that "actual cash value" and "depreciation" are ambiguous terms that must be construed in favor of insureds under Missouri law and therefore State Farm breached the insurance contract when it depreciated labor in estimating actual cash value.  LaBrier v. State Farm Fire & Cas. Co., 147 F. Supp. 3d 839, 846-47, 849-51 (W.D. Mo. 2015) (LaBrier I).

Based upon its decision denying State Farm's motion to dismiss, the district court ordered full discovery before a class was certified and appointed a special master to supervise discovery disputes.  After much wrangling over access to State Farm's claims-adjusting database and other issues, the special master in Special Master Order No. 4 ordered State Farm to answer interrogatories asking it to identify for all 144,900 putative class members (i) "labor depreciation that was actually withheld," (ii) the date labor depreciation was withheld, (iii) any labor depreciation State Farm subsequently paid as replacement cost benefits, and (iv) any facts that support State Farm's affirmative defenses.

The district court overruled State Farm's objections to Order No. 4, concluding that State Farm failed to establish that the Order caused an undue burden in light of the discovery's relevance and State Farm's refusal to provide another method to discover the information. LaBrier v. State Farm Fire & Cas. Co., 314 F.R.D. 637, 641-43 (W.D. Mo. 2016) (LaBrier II). State Farm petitioned for a writ of mandamus, asking this Court to vacate what it alleges are overly-burdensome discovery orders. On the day State Farm filed its mandamus petition, the district court certified a class consisting of:

> All State Farm Fire and Casualty Company . . . property insurance policyholders who submitted a claim for structural damage to a property in Missouri, and whose actual cash value . . . payment was reduced by the withholding of labor depreciation, during the time period from March 20, 2005 to the date of trial, inclusive.

The court excluded only insureds who were paid their policy limits and those whose claims were the subject of appraisal or litigation. LaBrier v. State Farm Fire & Cas. Co., 315 F.R.D. 503, 510-11 (W.D. Mo. 2016) (LaBrier III). We granted State Farm leave to appeal the class certification, see Fed. R. Civ. P. 23(f), consolidated the appeal with State Farm's petition for a writ of mandamus, and now reverse.

## I.

No class action may be certified unless the party seeking certification "affirmatively demonstrate[s] his compliance with Rule 23." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) (quotation omitted). "Here, the district court certified the class[] under Rule 23(b)(3), which requires finding 'that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" Powers v. Credit Mgmt. Servs., Inc., 776 F.3d 567, 569 (8th Cir. 2015).

-4-

"An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016) (quotation omitted). "What matters to class certification . . . is not the raising of common 'questions' -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011) (quotation omitted). This "preliminary inquiry . . . may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case." Powers, 776 F.3d at 569 (quotation omitted); see Comcast, 133 S. Ct. at 1432. To prove a breach of contract, LaBrier must show: (1) the existence of a contract; (2) the rights and obligations of the parties; (3) State Farm's breach; and (4) the damages she suffered. See Kieffer v. Icaza, 376 S.W.3d 653, 657 (Mo. 2012). The preliminary predominance inquiry requires "rigorous analysis" of whether "the same evidence will suffice for each member to make a prima facie showing" that the insurance contract was breached, causing injury. Avritt v. Reliastar Life Ins. Co., 615 F.3d 1023, 1029 (8th Cir. 2010) (quotation omitted); see Comcast, 133 S. Ct. at 1433; Ebert v. Gen. Mills, Inc., 823 F.3d 472, 479-80 (8th Cir. 2016).

On appeal, State Farm challenges the district court's determination that common issues predominate. In certifying the class, the district court noted (i) "the overarching, undisputed, and common fact of State Farm's practice of withholding payment from all its insureds for the depreciated labor component," and (ii) the court's prior resolution of "a central legal question . . . that the terms 'actual cash value' and 'depreciation' as used in State Farm's policy are ambiguous and must be construed in favor of the insureds." LaBrier III, 315 F.R.D. at 513. Therefore, the court concluded, common questions predominate: "At a minimum, LaBrier has presented facts and law that establish a prima facie claim for breach of contract for

-5-

herself and the class . . . . [T]he theory of breach is the same for each class member -- State Farm wrongfully deducted labor depreciation from each [actual cash value] payment." Id. at 517. If we were to conclude, as we do, that State Farm's method of determining estimated "actual cash value" does not breach its replacement cost contract, then there is no basis to certify a class of insureds who suffered unique, individual covered losses, and therefore no basis to sustain the special master's burdensome classwide discovery orders. Accordingly, we will begin -- and ultimately end -- with that issue.[1]

## II.

The basic premise of traditional property insurance is the concept of indemnity. The insured who suffers a covered loss is entitled to receive full, but not more than full, value for the loss suffered, to be made whole but not be put in a better position than before the loss. Policies that provide this level of coverage are universally known as actual cash value policies. See, e.g., Travelers Indem. Co. v. Armstrong, 442 N.E.2d 349, 352 (Ind. 1982); 12 Couch on Insurance § 175.5 (3d ed. 2005 & 2017 Supp.). The limitation of property loss coverage to the insured's actual loss serves the public policy of preventing over-insurance, which can be an "inducement to destroy property in order to procure the insurance upon it." Daggs v. Orient Ins. Co. of Hartford, 38 S.W. 85, 87 (Mo. 1896), aff'd, 172 U.S. 557 (1899).

In a standard property insurance policy, "damages are to be measured by the difference between the reasonable values of the property immediately before and immediately after the casualty." Wells v. Mo. Prop. Ins. Placement Facility, 653 S.W.2d 207, 210 (Mo. 1983). "The value of the property . . . immediately before the

---

[1]LaBrier argues that we should remand to the district court to resolve this predominant, common question of contract interpretation. This contention is without merit. Under Missouri law, we review the meaning of insurance policy language *de novo* and need not give deference to the trial court's interpretation. Porter v. Shelter Mut. Ins. Co., 242 S.W.3d 385, 388 (Mo. App. 2007) (quotation omitted).

loss is, of course, equivalent to the actual value of the property at the time of the loss." Id. at 214. "Thus, the insured bears the share of the loss resulting from deterioration, obsolescence, and similar depreciation of the property's value at the time of the loss." Dollard v. Depositors Ins. Co., 96 S.W.3d 885, 889 (Mo. App. 2002). Under Missouri law, "[a]ctual cash value means a depreciated sum, i.e., the difference between the reasonable value of the property immediately before and immediately after the loss." Porter, 242 S.W.3d at 390, citing Wells and Dollard. The district court erred in concluding that Missouri law does not define "actual cash value" and therefore the term is ambiguous absent a definition in the policy. LaBrier I, 147 F. Supp. 3d at 846.[2]

---

[2]The district court rejected the Supreme Court of Missouri's definition of actual cash value in Wells because Wells "involved" statutes dealing with damage caused by fire, Mo. Rev. Stat. §§ 379.140, 379.150, and we held that limitations in those statutes do not apply when a loss is caused by risks such as a hailstorm, Cincinnati Ins. Co. v. Bluewood, 560 F.3d 798, 803-04 (8th Cir. 2009). 147 F. Supp. 3d at 844-45. That was a misreading of Bluewood, a case in which the policy defined "actual cash value," the district court instructed the jury in accordance with the policy definition, and we rejected the insured's contention that § 379.150 *mandated* a different instruction. 560 F.3d at 802-04. In Wells, the Court concluded that an insured who elects to take a cash payment is "entitled under § 379.150 [to] a sum 'equal to the damage done on the property' . . . [which] our courts have long held . . . to be determined by the difference in value of the property immediately before and immediately after the loss." 653 S.W.2d at 214. Missouri courts have consistently applied this principle in reviewing damage awards for real property losses resulting from fire *and* other insured risks *when the applicable policy did not contain a different definition of actual cash value.* See Warren Davis Props. V, L.L.C. v. United Fire & Cas. Co., 4 S.W.3d 167, 173 (Mo. App. 1999) (sprinkler water damage); Glasgow v. Cole, 168 S.W.3d 511, 516-17 (Mo. App. 2005) (partial fire loss). If a claim requires valuing a real property loss, it may be reversible error not to give mandatory jury instructions that adopt the "difference in value" standard in Wells, MAI 4.02, *and* define "fair market value," MAI 16.02. Under Missouri law, "fair market value" and "actual cash value" are "substantially synonymous." Pannell v. Mo. Ins. Guar. Ass'n, 595 S.W.2d 339, 355 (Mo. App. 1980).

While the term "actual cash value" has an unambiguous meaning under Missouri law -- the difference in the fair market value of the damaged property immediately before and after the loss -- it is a value that must be estimated. Conflicting estimates must be determined by a jury, unless the parties agree as to the amount of the damage or have it determined by an appraisal method agreed to in the policy. See Dollard, 96 S.W.3d at 890. For example, if the insured installed a new roof the day before a storm caused its total collapse, the immediately-before value and the actual cash value of the loss will doubtless be the *full cost* paid to the contractor to install the now-worthless roof (leaving aside other possible coverages such as loss of use). But roofs deteriorate over time (some more than others), and under an actual cash value policy the insured bears the share of the loss resulting from this deterioration. Therefore, a reduction in the immediately-before value of the property must be estimated. A "depreciation" deduction is the most common, but not the only acceptable method of estimating the reduced fair market value of damaged property.

"Depreciation" is a concept with a well understood meaning -- "decline in an asset's value because of use, wear, obsolescence, or age." *Depreciation*, Black's Law Dictionary (9th ed. 2004). Therefore, in Bluewood, we concluded that a policy defining "actual cash value" as "replacement cost less a deduction that reflects depreciation, age, condition and obsolescence" was unambiguous. 560 F.3d at 802. As a means of estimating an asset's value, the concept of depreciation is unambiguous, the district court's contrary conclusion notwithstanding. But the method of calculating a depreciation deduction is subject to conflicting opinion as to the reasonableness of the resulting estimate.

Black's Law Dictionary lists no fewer than ten different depreciation methods to estimate the decline in an asset's value over time. All deduct depreciation from the initial full cost of the damaged asset, because that was the insured's investment. For example, if the insured purchased a new roof at a fully-installed cost of $25,000 fifteen years before it was demolished by fire or other covered risk, and an expert

opined that the roof had a twenty-five-year useful life when installed, the estimated actual cash value of the roof immediately before the loss would be $10,000, using the annual straight-line depreciation method. But unless the parties agreed to this estimate (or this method of estimating), a jury could reject that estimate based on other valuation evidence it found more probative. See, e.g., Sharaga v. Auto Owners Mut. Ins. Co., 831 S.W.2d 248, 252-53 (Mo. App. 1992) (insured's testimony as to the value of real property before and after a covered loss can be sufficient evidence supporting the jury's damage award). As one commentator posed the issue:

> Insurance law is not concerned with the estimated depreciation charged off on the books of business establishment but rather with the actual deterioration of a structure by reason of age and physical wear and tear, computed at the time of the loss.

Note, Valuation & Measure of Recovery Under Fire Insurance Policies, 49 Colum. L. Rev. 818, 823 (1949).

### III.

By adhering to the core principle of indemnity, which limits the insured's covered loss to the value of the damaged asset at the time of the loss, actual cash value policies work a hardship, particularly when the insured suffers a partial loss and needs to repair or replace the damaged component with a more valuable new item in order to restore use of the entire dwelling. As one court described this dilemma:

> Since fire is an unwanted and unplanned for occurrence, why can't the owner of an older home buy insurance to cover the full cost of repair even if those repairs make it a better or more valuable building? . . . Instead of apportioning the cost of repair after a fire between the actual cash value, to be paid by the insurer, and the betterment to be paid by the insured, why can't the policyholder simply pay a higher premium

each year but not have to pay anything more to have his home fully repaired in the event of fire?

Travelers v. Armstrong, 442 N.E.2d at 353. Spurred by post-World War II housing shortages and inflation, the legislatures of many States authorized, and major property insurers issued, policies that responded to this dilemma with replacement cost coverage. Missouri did not enact legislation, but its courts enforced replacement cost coverage provisions, with an important caveat reflecting the indemnity principle:

> The purpose of the replacement cost coverage was to make funds available that would enable plaintiffs to replace their destroyed or damaged premises . . . notwithstanding that the value of those premises before the loss had been lessened by depreciation. Plaintiffs were not, however, entitled to more than the actual cash value of the destroyed or damaged premises until repair, restoration or replacement of those premises was completed."

Miller v. Farm Bureau Town & Country Ins. Co., 6 S.W.3d 432, 438 (Mo. App. 2000); see Federated Mut. Ins. Co. v. Moody Station & Grocery, 821 F.3d 973, 977-78 (8th Cir. 2016).

These judicial precedents establish that State Farm was *obligated by Missouri law* to include an actual cash value payment option in its replacement cost coverage policy, because actual cash value -- a true indemnity payment -- is all the law allows an insurer to pay if the insured elects not to repair, even though she has paid an increased premium for the additional benefit of replacement cost coverage -- a repaired asset worth more than at the time of loss. Unless it contests coverage, State Farm also has a contractual duty to efficiently determine and pay the estimated actual cash value, in part to help the insured finance repair and replacement if she elects to do so, since payment of the additional replacement cost coverage may not be made until repairs are completed. To make the claims process work effectively for both parties, the insurer's claims adjuster needs to expeditiously estimate *both* the actual

cash value it will initially pay and the replacement cost benefit it may ultimately pay, and disclose those estimates to the insured. Again, unless the parties have agreed otherwise, these estimates are not binding on the insured, even though State Farm has agreed in the policy to make timely payments in accordance with its estimates.

Replacement cost insurance covers "the share of the loss resulting from deterioration, obsolescence, and similar depreciation of the property's value at the time of the loss." Dollard, 96 S.W.3d at 889. Replacement cost policies are often referred to as covering "the cost of repair or replacement without deduction for depreciation." Alessi v. Mid-Century Ins. Co., Inc., 464 S.W.3d 529, 532 (Mo. App. 2015). But this formulation is imprecise -- what is depreciated to determine actual cash value at the time of the loss is the asset's full original cost, not its replacement cost. Cf. Porter, 242 S.W.3d at 387 n.2. However, determining actual cash value by depreciating replacement cost -- the method employed by State Farm in this case and apparently by most property insurers nationwide -- is an eminently practical and reasonable method for making an initial *estimate* of actual cash value at the time of loss. The insurer's adjuster must prepare an estimate of replacement cost, making that figure readily available. Using it saves the insured from the potentially difficult and burdensome task of determining the original cost of the damaged component. Moreover, since inflation and other factors are likely to make the replacement cost of a damaged component greater than its original cost, basing actual cash value on the depreciated value of replacement cost produces a larger initial payment to the insured. Not surprisingly, therefore, both LaBrier and the district court agree that "repair or replacement cost minus depreciation" is a reasonable way to compute actual cash value. LaBrier I, 147 F. Supp. 3d at 846. They assert that the method State Farm uses to calculate replacement cost depreciation is a breach of contract *every time State Farm employs it*.

In coming to this conclusion, the district court ignored what State Farm was estimating -- the depreciated value of the damaged property *at the time of loss*. As

previously explained, a more precise estimate of that value would depreciate *the full original cost* of the asset to account for its decline in value over time. State Farm's depreciation method reasonably substitutes replacement cost for original cost because that value is more readily available and to the insured's advantage. But to avoid further distorting the value estimate, State Farm depreciates *the full replacement cost* of the asset, typically, the amount a contractor will charge to replace the roof and other damaged parts, which includes the cost to install as well as the cost of materials. In evaluating a depreciation method in this context, it matters not whether "labor" is customarily depreciated in other business accounting contexts. The question is whether depreciating what a contractor will charge to replace the partial loss is a reasonable method of estimating "the difference in value of the property immediately before and immediately after the loss." Wells, 653 S.W.2d at 214. As the district court never addressed this question, its decision in LaBrier I must be reversed.

An equally significant error was to ignore the fact that, while the policy's replacement cost coverage obligated State Farm to estimate actual cash value and replacement cost and make an initial actual cash value payment, these estimates were not agreed to by LaBrier and were therefore subject to review by a jury in a lawsuit to determine the amount of her loss. As the Supreme Court of Minnesota observed in responding to a labor-cost-depreciation question certified by a federal district court, when the insurance policy does not define the term "actual cash value,"

> embedded-labor-cost depreciation is one factor that the trier of fact may *consider* and weigh among other factors to determine the actual cash value of the damaged property . . . . We are not persuaded that depreciation of embedded labor costs is so illogical that it may never be considered. But whether embedded-labor-cost depreciation is logical or helpful to the trier of fact is ultimately a question of fact, not law . . . . Thus, arguments about whether labor-cost depreciation is "logical" according to accepted methods of appraisal in a given case are best presented to an appraisal panel or via expert testimony before a jury.

Wilcox v. State Farm Fire & Cas. Co., 874 N.W.2d 780, 785 (Minn. 2016) (emphasis in original). We agree with this analysis. More importantly, we conclude that the Supreme Court of Missouri -- which will not accept certified questions of Missouri law from a federal court -- would likewise conclude that this way of resolving the issue is consistent with Missouri law as reflected in Wells and Missouri Court of Appeals decisions applying Wells. Accordingly, although we do not rule out the possibility that State Farm's use of the Xactimate estimating methodology would produce an unreasonable estimate of the actual cash value of some partial losses, this issue may only be determined based on all the facts surrounding a particular insured's partial loss. Thus, there are *no* predominant common facts at issue, and the decision certifying a class in LaBrier III must be reversed. See Halvorson v. Auto-Owners Ins. Co., 718 F.3d 773, 779-80 (8th Cir. 2013). Likewise, the district court's orders upholding premature classwide discovery in LaBrier II must be vacated.

## IV.

The orders of the district court denying State Farm's motion to dismiss and certifying a class under Rule 23(b)(3) are reversed, and the case is remanded with directions to dismiss LaBrier's complaint. In light of this disposition, State Farm's petition for a writ of mandamus is denied as moot.

_____