[Cite as *Davenport v. Progressive Direct Ins.*, 2025-Ohio-2449.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

MON CHERI DAVENPORT, ET AL.,    :

    Plaintiffs-Appellees,    :

                                 No. 114306

v.                    :

PROGRESSIVE DIRECT INSURANCE,  :
INSURANCE COMPANY, ET AL.,

                        :

    Defendants-Appellants.

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 10, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-22-961647

---

### *Appearances:*

Shamis & Gentile, P.A., and Andrew J. Shamis; Carney Bates & Pulliam, PLLC, Henry Bates and Lee Lowther, pro hac vice; Normand PLLC, Edmund A. Normand, and Jacob L. Phillips; Edelsberg Law, P.A., Scott Edelsberg, and Christopher Gold, *for appellees.*

KING & SPALDING LLP, Jeffrey S. Cashdan, Zachary A. McEntyre, James Matthew Brigman, Allison Hill White, Seth I. Euster, Paul Alessio Mezzina, Amy P. Upshaw, and Julia Barrett Bates, pro hac vice; Tucker Ellis LLP, Karl A. Bekeny, Jennifer L. Mesko, and Ariana E. Bernard, *appellants.*

MICHAEL JOHN RYAN, J.:

{¶ 1} The defendants-appellants are Progressive Direct Insurance Company, Progressive Specialty Insurance Company, and Progressive Preferred Insurance Company (collectively "Progressive"). The plaintiffs-appellees are Mon Cheri Davenport, Candice Watts, and Kathi Cassi (collectively "plaintiffs"). The plaintiffs initiated this lawsuit individually and on behalf of all others similarly situated; they filed a motion for class certification, which the trial court granted. In this appeal, Progressive asks us to determine whether the trial court abused its discretion by granting the plaintiffs' motion for class certification. After a careful and thorough review of the facts and pertinent case law, we find that the trial court did not abuse its discretion and affirm its judgment.

**Factual and Procedural History**

{¶ 2} The plaintiffs initiated this case in April 2022. The controlling pleading, the plaintiffs' amended complaint, was filed in October 2022. In the amended complaint, the plaintiffs allege that, as insureds under Progressive policies, Progressive "thumbed the scale" in issuing payments for their and other similarly situated claimants in Ohio for loss of a totaled used vehicle. Amended complaint, ¶ 1.

{¶ 3} The plaintiffs' policies with Progressive required Progressive to pay insureds the actual cash value ("ACV") of their total-loss claims. Under the policies, ACV is based on the market value, age, and condition of the vehicle at the time the loss occurs. Progressive used valuation reports prepared by Mitchell International,

Inc. ("Mitchell") to determine the ACV of the vehicles. Mitchell used "projected sold adjustments" ("PSA") in calculating the ACV, and according to the plaintiffs, the PSAs are

> (a) arbitrary; (b) contrary to appraisal standards and methodologies; (c) not based in fact, as they are contrary to the used car industry's market pricing and inventory management practices; (d) not applied by the major competitor of Defendants' vendor Mitchell; and (e) on information and belief, not applied by Defendants and Mitchell to insureds in other states like California and Washington.

Amended complaint at *id.*

{¶ 4} The PSA line-item deduction Mitchell used is the plaintiffs' sole challenge to Progressive's valuation of their totaled vehicles.

**The Mitchell Reports**

{¶ 5} The Mitchell reports were generated by Mitchell's WorkCenter Total Loss ("WCTL") platform. The reports identified comparable vehicles that were either listed for sale or recently sold. When a comparable vehicle in the WCTL database featured a list price — and was not listed by what Mitchell refers to as a "non-haggle" dealer — Mitchell automatically applied a PSA to reduce the comparable price used to generate its report. Progressive maintains that the deduction reflects consumer behavior; that is, the assumed consumer practice of negotiating a price lower than the list price.

{¶ 6} The record reflects that the PSAs are generated by a team at J.D. Power that compares a database of list and sold prices matched by vehicle identification number ("VIN") from a group of dealers comprising the Power

Information Network. Before calculating the PSA, J.D. Power eliminated all the data reflecting sales at or above the list price until July 2021. After July 2021, J.D. Power eliminated all the data reflecting sales above list price. According to Progressive, the data J.D. Power eliminated were "outliers." Progressive relied on the remaining data as a reflection of the price negotiation that occurs in the used-car market.

{¶ 7} In addition to the PSAs, the Mitchell reports made other adjustments based on observed differences between an insured's vehicle and a comparable vehicle, such as for mileage, trim, and equipment. The WCTL then averaged the adjusted prices of all the comparable vehicles identified to generate the loss vehicle's "base" market value. Further adjustments were made, as needed, for considerations such as aftermarket parts, refurbishment, condition, and prior damage. After all of these adjustments, Mitchell arrived at the ACV for the insureds' totaled vehicles. Taxes, fees, and deductibles were then automatically calculated and applied to the ACV to determine each insured's claim payment.

**Class-Certification Discovery**

{¶ 8} The parties engaged in discovery regarding class certification. The plaintiffs' experts concluded the following. With the exception of the PSA deduction, Mitchell's evaluation of the claims followed the industry standard. Regarding the PSA deduction, one of the plaintiffs' experts opined that the deduction was not based on observed, verified data; rather, he believed the deduction was speculative — it was based on conjecture about consumer negotiation, premised on manipulated

data.  The expert believed that removing the PSA deduction from the Mitchell reports would result in the vehicles' ACVs.

{¶ 9} Another expert believed that the PSA deduction was inconsistent with industry standards.  Specifically, he opined that the modern standard accounts for the internet-driven market where dealerships price their vehicles to market and list that market price online.  In other words, there is not much negotiation in today's car-sales market according to the expert — cars generally sell at their list price.  And when they sell for less than their list price in a cash transaction, it is because of reasons other than negotiation, such as the consumer traded in a valuable vehicle or financed through the dealer.

{¶ 10} Another of the plaintiffs' experts believed that Mitchell's elimination of what she found to be a considerable amount of data underlying the PSA invalidated the Mitchell reports.  The expert submitted a methodology for calculating each class member's damages; her methodology deleted the PSA from each class member's Mitchell report.

{¶ 11} Further, another expert for the plaintiffs analyzed a large set of data from used-vehicle sales reported by state Departments of Motor Vehicles; his analysis consisted of millions of transactions over several years.  The expert found that the median sold-to-list ratio per year was 1.0 and the mean sold-to-list ratio for each year was approximately 1.0.  The plaintiffs contend that those findings support their allegation that the standard in the used-car market is for vehicles to sell at their list price.

{¶ 12} In opposition to the plaintiffs' positions, Progressive contended that, while the subject policies provide that it will pay its insureds the ACV of their totaled vehicles, the policies are silent on whether Progressive must use any particular adjustment to determine the value of a totaled vehicle. Progressive maintains that there were numerous other legitimate methods it could have used to estimate the ACV for the vehicles and those methods often produce a range of different values. Progressive further contends that determining a vehicle's ACV requires consideration of factors specific and individual to each car. Moreover, Progressive maintains that the plaintiffs failed to present evidence that PSAs are categorically inaccurate and even one of plaintiffs' experts opined that vehicles often do sell for less than list price.

{¶ 13} Progressive presented expert evidence that the Mitchell valuations are individualized and based on "hard data" from real transactions, specifically, data from J.D. Power. Thus, according to Progressive, PSAs are not blanket reductions uniformly applied. Rather, when a PSA is applied to a comparable vehicle, the amount varies depending on factors such as vehicle make, model, year, and where the insured resides. To this end, Progressive presented expert evidence that PSAs are "remarkably accurate."

{¶ 14} Progressive further maintains that a sample of the class of the plaintiffs shows that their contract claims are "replete with individualized issues." And according to Progressive, some members would not be entitled to any recovery, even if Progressive did undervalue their total losses, and some members

"come out ahead" using Progressive's valuation as opposed to the plaintiffs' experts valuation.

{¶ 15} After the parties engaged in discovery relative to class certification, the plaintiffs filed a motion to certify the following class:

> All persons who made a first-party claim on a policy of insurance issued by Progressive Direct Insurance Company, Progressive Specialty Insurance Company, or Progressive Preferred Insurance Company ("Progressive"), to an Ohio resident where the claim was submitted from April 6, 2014, through the date an order of certification is entered, and Progressive determined that the vehicle was a total loss and based its claim payment on an Instant Report from Mitchell where a Projected Sold Adjustment was applied to at least one comparable vehicle.

{¶ 16} The trial court held a hearing on the motion, and thereafter, issued the subject judgment granting the plaintiffs' request for class certification. This appeal ensues, with Progressive raising the following three assignments of error for our review:

> I. The trial court erred by finding in its August 15, 2024 order granting Plaintiff's motion for class certification that it must "accept the allegations [in the class certification motion] as true."

> II. The trial court erred and abused its discretion by granting class certification and finding that common questions predominate for the class even though Plaintiffs cannot establish liability, standing, or damages without an individualized inquiry into the actual cash value of each class member's vehicle.

> III. The trial court erred in concluding that the question of whether PSAs are valid is common.

**Law and Analysis**

**Requirements for Certification; Civ.R. 23**

{¶ 17}  Civ.R. 23 governs certification of class actions and provides that the following seven requirements must be satisfied before a court may certify a case as a class action:  (1) an identifiable class must exist and the definition of the class must be unambiguous; (2) the named representatives must be members of the class; (3) the class must be so numerous that joinder of all members is impractical; (4) there must be questions of law or fact common to the class; (5) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; (6) the representative parties must fairly and adequately protect the interests of the class; and (7) one of the three Civ.R. 23(B) requirements must be satisfied. *Hamilton v. Ohio Sav. Bank*, 82 Ohio St.3d 67, 71 (1998).  Civ.R. 23(B) provides in pertinent part that a class action may be maintained if:

> (3) The court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
>
>> (a) The class members' interests in individually controlling the prosecution or defense of separate actions;
>>
>> (b) The extent and nature of any litigation concerning the controversy already begun by or against class members;
>>
>> (c) The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>
>> (d) The likely difficulties in managing a class action.  Prior to granting a motion for class certification, the trial court must first

determine whether the plaintiff proved each of the requirements in Civ.R. 23 by a preponderance of the evidence.

Civ.R. 23(B)(3).

{¶ 18} Civ.R. 23 is virtually identical to Fed.R.Civ.P. 23. Accordingly, Ohio courts may look to federal authority to interpret the Ohio rule. *Cullen v. State Farm Mut. Auto. Ins. Co.*, 2013-Ohio-4733, ¶ 14.

**Standard of Review**

{¶ 19} Appellate review of a trial court's decision on a motion for certification in class action lawsuits is for an abuse of discretion. *Rimmer v. CitiFinancial*, 2020-Ohio-99, ¶ 30 (8th Dist.). "The appropriateness of applying the abuse-of-discretion standard in reviewing class action determinations is grounded not in credibility assessment, but in the trial court's special expertise and familiarity with case-management problems and its inherent power to manage its own docket." *Washington v. Spitzer Mgt.*, 2003-Ohio-1735, ¶ 9 (8th Dist.), citing *Hamilton* at 70. An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

**The Trial Court Engaged in a Rigorous Analysis**

{¶ 20} In its first assignment of error, Progressive contends that the trial court erred in its review and cites the following sentence in the court's judgment in support of its contention: "In analyzing whether class treatment is appropriate, courts accept the allegations as true and should not adjudicate the merits of a claim."

August 15, 2024 judgment, p. 4, citing *Ojalvo v. Bd. of Trustees of Ohio State Univ.*, 12 Ohio St.3d 230, 233 (1984).

{¶ 21} In *Ojalvo*, the plaintiff filed a class action in the Court of Claims alleging that he and several thousand other employees of The Ohio State University had not been fully compensated under their written employment contracts. The Court of Claims denied certification for several reasons, including that there was "no certainty that a common issue of breach of three to six thousand contracts probably exists." *Id.* The Tenth District Court of Appeals affirmed. *Id.* at syllabus.

{¶ 22} On appeal to the Ohio Supreme Court, the Supreme Court held that the Court of Claims abused its discretion in denying certification of the class. The Court explained that "it appears that the Court of Claims was not reviewing the propriety of class certification but was attempting, contrary to the applicable law, to reach the merits of the claim. Class action certification does not go to the merits of the action." *Id.*, citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).

{¶ 23} In *Stammco, L.L.C. v United Tel. Co. of Ohio*, 2013-Ohio-3019, the Ohio Supreme Court clarified "precisely what *Ojalvo* held and what it did not hold." *Stammco* at ¶ 43. The court clarified as follows:

> *Ojalvo* held that the Court of Claims improperly decided the case on the underlying merits, i.e., that there was no certainty that a breach probably existed. *Ojalvo* did not hold that a court is prohibited from probing the merits of a plaintiff's claims to determine whether class certification is proper under Civ.R. 23. In *Ojalvo*, we cited *Eisen* only for the proposition that a court cannot decide the case on the merits at the certification stage. *Id.* at 233. *Ojalvo* is consistent with [*Wal-Mart Stores, Inc. v.*] *Dukes*[, 564 U.S. 338 (2011)] and *Amgen* [*v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455 (2013)] to

the extent that a trial court may probe the underlying merits of the plaintiff's claim in order to determine whether the prerequisites for class certification are satisfied under Civ.R. 23.

*Stammco* at *id.*

{¶ 24} The *Stammco* Court held that "at the certification stage in a class-action lawsuit, a trial court must undertake a rigorous analysis, which may include probing the underlying merits of the plaintiff's claim, but only for the purpose of determining whether the plaintiff has satisfied the prerequisites of Civ.R. 23." *Id.* at ¶ 44.

{¶ 25} Progressive, therefore, is correct that the trial court was not to merely accept the plaintiffs' allegations in their amended complaint as true. Despite that single mention to that standard in its judgment, it is clear that the trial court did not engage in rote acceptance of the plaintiffs' claims. The parties engaged in discovery, and the trial court held a hearing on the plaintiffs' motion for certification, at which in-depth arguments were made for and against certification based on the evidence adduced during discovery. And the trial court's judgment goes well beyond reciting mere allegations from the plaintiffs' amended complaint in support of its decision to grant certification; rather, the court referred to the evidence and explained how it related to its decision.

{¶ 26} This court has previously addressed this issue and held that

[t]he trial court not only reviewed the allegations in the complaint, but also reviewed the Agreement and other documents related to [the plaintiff's] lease and the [subject] program. These documents lend evidentiary support to the allegations in the complaint. Accordingly, we find that the trial court's judgment entry demonstrates a careful

consideration of the relevant facts, applicable law, and evidence and thus satisfies the *Cullen*[, 2013-Ohio-4733] standard.

*Goree v. Northland Auto Enterprises*, 2020-Ohio-3457, ¶ 39 (8th Dist.).

{¶ 27} Similar to the trial court in *Goree*, the trial court here engaged in the required rigorous analysis before granting the plaintiffs' motion for class certification. The first assignment of error is overruled.

**Trial Court Did Not Abuse Its Discretion by Finding a Common Question Predominates**

{¶ 28} In its second and third assignments of error, Progressive contends that the trial court abused its discretion by finding that the validity of the PSA poses a common question that predominates this case. We disagree.

{¶ 29} Civ.R. 23(A)(2) requires questions of law or fact to be common to the class. "Commonality requires 'a common nucleus of operative facts.'" *Binder v. Cuyahoga Cty.*, 2019-Ohio-1236, ¶ 115 (8th Dist.), quoting *Warner v. Waste Mgt.*, 36 Ohio St.3d 91, 97 (1988). Commonality exists where a common factual question is common to the applicable cause of action. *Binder* at *id.* Commonality is often satisfied without much difficulty for the parties and very little exertion of time by the judge. *Id.*

{¶ 30} Progressive contends that whether it breached its contractual obligations to the plaintiffs is an individualized issue. The plaintiffs have alleged, and provided some evidence, that the PSA deduction, which Progressive applied to all the class members, always results in a downward deduction and, thus, Progressive's valuation of the plaintiffs' claims resulted in an underpayment of the

ACV of their vehicles, in breach of their policies. Further, regarding the individualized nature of the plaintiffs' claims, the plaintiffs admit that vehicle valuations are individualized, and maintain that "the Mitchell reports have already done those individualized valuations with exacting detail . . . ." The plaintiffs are not contesting the individualized valuations; rather, they are only contesting the line-item PSA deductions. At this stage, the plaintiffs have shown that their contracts are materially similar and they are proceeding on the same theory of liability. *See Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 459 (6th Cir. 2020).

{¶ 31} Moreover, the trial court did not abuse its discretion by finding that the common issues predominate. We note that four federal circuit courts have held that insureds' challenge to a line-item deduction as categorically improper is a common, predominate liability issue. *See Jama v. State Farm Mut. Auto. Ins. Co.*, 113 F.4th 924 (9th Cir. 2024); *Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700 (5th Cir. 2020); *Hicks*; and *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371 (8th Cir. 2018).

{¶ 32} In *Hicks*, for example, the plaintiffs and State Farm entered into replacement-cost homeowner insurance contracts. The standard-form policy set forth a two-step settlement process which obligated the insurer to pay for property damage. First, before the insured made any repairs, State Farm was required to pay the ACV "at the time of the loss of the damaged part of the property," up to the policy's liability limit, "not to exceed the cost to repair or replace the damaged part of the property." *Id.* at 455. The ACV was calculated under the policy by estimating

the amount it would cost to repair or replace damaged property and subtracting depreciation and the deductible.

{¶ 33} During the relevant time frame, State Farm determined the ACV first by sending an adjuster to inspect the damage and estimate the reconstruction cost. State Farm used a software program, Xactimate, that it had exclusively used since 1990. The company inputted the adjuster's reconstruction cost estimate — the "replacement cost value" ("RCV") — and depreciated costs for both materials and labor. Xactimate produced an ACV calculation (RCV minus material and labor cost depreciation), subtracted the insured's deductible, and then State Farm paid that Xactimate estimate to the insured.

{¶ 34} The insureds did not have to spend the ACV payment or make repairs to their property. If they opted to not make repairs or made repairs for less than the ACV payment, they did not have to return any of the ACV payment to State Farm. The second step of the settlement process was implicated if an insured made repairs and incurred costs exceeding the ACV payment, in which case, the insured could seek further payment from State Farm. Specifically, the insured could seek repayment of replacement cost benefits based on documentation showing the repairs made and the costs incurred.

{¶ 35} In 2014, fires destroyed the plaintiffs' homes. State Farm accepted coverage and issued ACV payments to the plaintiffs. Using Xactimate, State Farm estimated one of the lead plaintiff's RCV as $206,068.88, including material and labor costs; subtracted the plaintiff's $500 deductible, $40,627.34 for depreciation

of materials and labor, and $8,125.54 for "general contractor overhead & profit on recoverable and non-recoverable depreciation"; and issued a $156,316 ACV payment. *Hicks*, 965 F.3d at 455. That plaintiff opted not to rebuild his home and instead purchased a new home for $75,000. He did not need to return any of his ACV payment, and he recovered none of the depreciated costs.

{¶ 36} For the second lead plaintiff, State Farm used Xactimate to estimate her RCV as $273,306.97, including costs for materials and labor; subtracted her $500 deductible, $60,751.32 in depreciation of materials and labor, and $12,150.68 for "general contractor overhead & profit on recoverable and non-recoverable depreciation"; and issued that plaintiff a $199,904.97 ACV payment. *Id.* at 456. That plaintiff repaired her home and later recovered the withheld depreciation.

{¶ 37} In their class action, the plaintiffs maintained that their ACV payments were miscalculated because State Farm included labor costs in its depreciation deduction in violation of Kentucky law. State Farm moved to dismiss the plaintiffs' contract claims; the district court denied the motion, finding that, under Kentucky law, State Farm could only depreciate costs for materials, not labor.

{¶ 38} State Farm filed a first appeal, and the Sixth Circuit Court of Appeals affirmed the district court's decision, holding that in insurance contracts that incorporate Kentucky's "replacement cost minus depreciation" formula, the insurer cannot depreciate costs of labor when determining ACV payments. *Hicks v. State Farm Fire & Cas. Co.*, 751 Fed.Appx. 703, 711 (6th Cir. 2018). Resolving the ambiguity in favor of the insured as required under Kentucky law, the Sixth Circuit

reasoned that "[a] layperson confronted with State Farm's policy," which incorporated Kentucky's ACV formula, "could reasonably interpret the term depreciation to include only the cost of materials" and not the costs of labor. *Id.* at 709.

{¶ 39} After the Sixth Circuit's decision, State Farm revamped its methodology to conform to the court's judgment and sent refunds to insureds who had received ACV payments between March 25, 2015, and July 25, 2015, the gap between the district court's decision on labor depreciation and the date State Farm stopped deducting labor depreciation costs. State Farm identified 1,854 claimants who needed refunds during that period. Providing the refunds was not an arduous task — State Farm simply changed the Xactimate parameters for calculating the claimants' ACV payments by unchecking a box so that labor depreciation was no longer subtracted from their RCV estimates.

{¶ 40} The plaintiffs sought class certification for insureds who had received payments arising from qualifying events that occurred from February 28, 2013, through July 25, 2015, and where the cost of labor was depreciated. The district court granted class certification, and State Farm appealed a second time.

{¶ 41} The Sixth Circuit again affirmed the district court's decision, finding both commonality and predominance. Regarding commonality, the court found that the plaintiffs' "claims share a common legal question central to the validity of each of the putative class member's claims: whether State Farm breached Plaintiffs'

standard-form contracts by deducting labor depreciation from their ACV payments." *Hicks*, 965 F.3d at 459.

{¶ 42} Regarding predominance, the court noted that individual damages calculations do not preclude class certification, but the plaintiffs must ensure that their formula calculates damages based only on their theory of liability. *Id.* at 460, citing *Glazer v. Whirlpool Corp.* (*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litigation*), 722 F.3d 838, 850 (6th Cir. 2013), and *Rikos v. P&G Co.*, 799 F.3d 497, 523 (6th Cir. 2015). The *Hicks* Court agreed with the district court that the "common labor depreciation question predominates over individual questions even though Plaintiffs' damages will vary." *Id.* at 460.

{¶ 43} Similar to *Hicks*, the plaintiffs in the instant case challenge a one-line item deduction — the PSAs — and that line item predominates over individual questions. Moreover, as with *Hicks*, should the plaintiffs here prevail, calculation of their new payments should be a relatively straightforward process, i.e., removal of the PSA deductions. *See Hicks* at 456-457 ("The corrected formula was a mouse-click away . . . State Farm records show that it took an average of 15 minutes to complete each review.").

{¶ 44} We also take note of *Volino v. Progressive Cas. Ins. Co.*, 2023 U.S. Dist. LEXIS 44666 (S.D.N.Y. Mar. 16, 2023), which mirrors this case. In *Volino*, the plaintiffs were each involved in car wrecks while insured by Progressive and Progressive deemed their vehicles to be total losses. The plaintiffs' policies stated that Progressive would pay the ACV of their vehicles in the event of a total-loss.

{¶ 45} Progressive used the same Mitchell reports and WCTL software as in this case in calculating the *Volino* plaintiffs' ACV. Progressive's methodology in valuing the *Volino* plaintiffs' claims — including use of the PSA — was the same as in the instant case. As with this case, the *Volino* plaintiffs accepted all aspects of Progressive's valuation methodology except the application of the PSA.

{¶ 46} The New York district court rejected Progressive's contention that individualized issues predominated over common questions. The court found that "[t]o the extent Progressive has identified individual issues that may need to be worked out at the margins, the critical common questions identified by Plaintiffs predominate over those individual inquiries." *Id*. at *24.

{¶ 47} We have considered the following cases Progressive cites and they have not persuaded us that the trial court abused its discretion by granting class certification: *Lewis v. Govt. Employees Ins.*, 98 F.4th 452 (3d Cir. 2024); *Sampson v. United Services Auto. Assn.*, 83 F.4th 414 (5th Cir. 2023); *Lara v. First Nat. Ins. Co. of Am.*, 25 F.4th 1134 (9th Cir. 2022); *Tarrify Props., LLC v. Cuyahoga Cty.*, 37 F.4th 1101 (6th Cir. 2022); and *In re State Farm Fire & Cas. Ins. Co.*, 872 F.3d 567 (8th Cir. 2017).

{¶ 48} A brief summation of these cases shows their distinctions from this case. In *Lewis*, an insurance regulation required insurance companies to itemize deductions. The plaintiffs challenged a negative condition adjustment of $1,006 in their report as "arbitrary and insufficiently itemized." According to their complaint, the plaintiffs were never paid an amount that was reduced by the adjustment they

challenged.  Instead, after applying the adjustment, the insurance company's vendor increased its valuation of the plaintiffs' vehicle by $886 to account for its condition. The insurance company then negotiated with the plaintiffs *and eventually applied a $1,200 upward adjustment in settlement of their claim.*  The court held that the plaintiffs lacked standing because the insurance company applied the "countervailing" adjustments and paid the claim.  *Id.* at 461.  The plaintiffs, therefore, were left alleging "a bare violation of New Jersey insurance rules," which the Third Circuit rejected as a basis for standing.  *Id.*

{¶ 49} In *Sampson*, the plaintiffs alleged the defendants United States Auto Association and USSA General Indemnity Company ("USAA") breached their contract by valuing cars using the CCC One Market Valuation Report ("CCC") which was allegedly illegal to use under a Louisiana regulation because it was not a "recognized used auto industry source." *Id.* at 417.  The plaintiffs contended that the National Automobile Dealers Association guidebook ("NADA") was a recognized source.  The plaintiffs claimed that  USAA was liable for not using that guidebook. However, the plaintiffs admitted that their liability theory was arbitrary because NADA was one of several sources allegedly permitted by Louisiana law.

{¶ 50} In *Lara*, 25 F.4th 1134, the plaintiffs claimed that the insurance company's "condition adjustments" violated a Washington state regulation requiring itemized deductions because the adjustments did not itemize or explain the adjustment, making it impossible to verify.  The *Lara* plaintiffs did not claim, as the plaintiffs here do, that the adjustments violated any provision of their insurance

policies and led to underpayment; they also did not, as the plaintiffs here do, present evidence of how to properly calculate ACV.

{¶ 51} In *Tarrify*, 37 F.4th 1101, the plaintiff initiated a Takings Clause claim on behalf of homeowners whose homes were seized for failing to pay property taxes under Ohio law; the law permitted counties to foreclose on tax-delinquent properties and transfer the properties to a land bank owned by the State. The properties were not appraised at the time of transfer; rather, the State simply forgave "any tax delinquency, and the fair market value of the land bec[ame] irrelevant[.]" *Id.* at 1104. The plaintiff claimed this constituted a taking without just compensation and sought to represent a class of "owners of tax-foreclosed properties in which the total value of that property exceeded the amount of the impositions on that property at the time the transfer occurred." *Id.* The plaintiff proposed that the property's market value could be determined by using the most recent previous tax assessment of the property.

{¶ 52} In denying class certification, the *Tarrify* Court noted that the tax valuations occurred every six years and that many of the homes had been abandoned after the most recent tax assessment but before the taking. Thus, the tax assessments failed to account for the property's "location, interior values, and other realities of measuring the fair market value of abandoned properties at the time of the alleged taking." *Id.* at 1109. In Ohio, "the assessed valuation of property is not evidence of value for" non-tax purposes. *Id.* at 1108.

{¶ 53} In *In re State Farm Fire & Cas. Ins. Co.*, 872 F.3d 567, the plaintiff alleged State Farm improperly deducted "labor depreciation" from her and other homeowners' ACV payment claims. The policy did not define ACV, and the district court found that the plaintiff offered a plausible reading that the term ACV did not permit labor depreciation under the controlling Missouri law. The court granted class certification on that common legal question.

{¶ 54} The Eighth Circuit Court of Appeals conducted a de novo review of this legal determination and reversed on the merits. Because the Missouri Supreme Court "will not accept certified questions of Missouri law," the court made a guess about how it would interpret the contract. *Id*. at 576. Based on its guess, the court reversed on the merits, holding that Missouri's common-law definition of ACV unambiguously permitted depreciating labor costs and therefore finding that State Farm's valuations methodology was "an eminently practical and reasonable method for making an initial estimate of [ACV] at the time of loss." *Id*. at 576–77. The Eighth Circuit remanded the case with a mandate to dismiss the plaintiff's complaint. Thus, once the plaintiff lost on the only common theory presented, there were no issues — predominating or otherwise — left for class certification, as the case was decided on its merits.

{¶ 55} *Lewis*, 98 F.4th 452; *Sampson*, 83 F.4th 414; *Lara*, 25 F.4th 1134; *Tarrify*, 37 F.4th 1101; and *In re State Farm* are all distinguishable from this case and do not lend support to Progressive's contention that the trial court here abused its discretion in granting class certification.

{¶ 56} We are also not persuaded by Progressive's reliance on two other cases — *Kroeger v. Progressive Universal Ins. Co.*, 2023 U.S. Dist. LEXIS 231824 (S.D. Iowa Nov. 20, 2023), and *Henson v. Progressive Premier Ins. Co.*, 2024 U.S. Dist. LEXIS 109026 (E.D.N.C. June 10, 2024). *Kroeger* acknowledged the line of cases upholding class certification but noted that those cases were not Eighth Circuit cases subject to Iowa law. *Id.* at *1-2, *29. And the policy in *Henson* did not define ACV or prescribe any method of calculating it. Thus, the *Henson* Court held that under North Carolina's "broad evidence" rule the insurance company's valuation was competent evidence of ACV. *Id.* at *12.

{¶ 57} On this record, the trial court did not abuse its discretion by finding that plaintiffs' contention about the PSA deduction as a means of valuing their claims raises common issues that predominate this litigation. The second and third assignments of error are overruled.

{¶ 58} Finally, the other requirements for class certification (which were unchallenged by Progressive) — identifiability, class representatives, numerosity, typicality, adequacy (under Civ.R. 23(A)), and superiority (under Civ.R. 23(B)) — were met.

{¶ 59} Having found no abuse of discretion with the trial court's decision to grant class certification, the trial court's judgment is affirmed.

It is ordered that appellees recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

MICHELLE J. SHEEHAN, P.J., and
EILEEN T. GALLAGHER, J., CONCUR